# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCY MARIE DADIAN WALLIS,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No.: 1:15-cv-01670 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF MARCY MARIE DADIAN WALLIS AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Marcy Marie Dadian Wallis asserts she is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her applications for benefits. Because the ALJ failed to identify legally sufficient reasons for to support the adverse credibility determination, the decision is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed her application for benefits on September 22, 2011, alleging disability beginning on May 1, 2007. (Doc. 12-6 at 2) The Social Security Administration denied Plaintiff's application at both the initial level and upon reconsideration. (*See generally* Doc. 12-4; Doc. 12-3 at 19) After

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for her predessessor, Carolyn W. Colvin, as the defendant in this suit.

requesting a hearing, Plaintiff testified before an ALJ on February 24, 2014. (Doc. 12-3 at 39) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on March 12, 2014. (*Id.* at 19-31) When the Appeals Council denied Plaintiff's request for review of the decision on September 3, 2015 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.    Relevant Medical Opinions**

Plaintiff had a gastric bypass in 2000, after which she was diagnosed with Guillain-Barre syndrome.  (Doc. 12-9 at 104-105)  However, it was later determined that Plaintiff "had a nutritional defect secondary to very rapid weight loss."  (*Id.* at 104)  She "had trouble moving all four extremities and was in a wheelchair for up to about two years."  (*Id.* at 105)  By 2008, Plaintiff regained the ability to walk and had "good sensation," though she also had "some occasional neuropathic type [shooting] pain in the extremities, arms and legs."  (*Id.* at 105)

Dr. Gareth Houghton performed a consultative psychological evaluation on August 12, 2008.  (Doc. 12-8 at 2)  Dr. Houghton noted treatment notes he reviewed indicated that Plaintiff "had "high anxiety and depression."  (*Id.*)  Dr. Houghton observed that Plaintiff's mood was euthymic; her judgment and insight were grossly intact; and there was "no evidence of hallucinations, delusional thinking or suicidal ideation."  (*Id.* at 4)  According to Dr. Houghton, Plaintiff "acknowledge[d] that she does isolate too much and … lost interest in things."  (*Id.*)  Plaintiff reported improvement with agitation, thinking, and concentration, but she felt stress over her relationship with her daughter.  (*Id.*)  Dr. Houghton diagnosed Plaintiff with major depressive disorder, chronic/recurrent, and pain disorder affected by psychological factors and a general medical condition.  (*Id.*)  He gave Plaintiff a current

GAF score of 55.[2]  (*Id.*)

Dr. Roger Wagner conducted an internal medicine evaluation on January 17, 2012.  (Doc. 12-9 at 104)  Plaintiff told Dr. Wagner she could "walk two to three blocks" and "sit for up to an hour if she [was] able to move around a bit."  (*Id.* at 105)  Plaintiff said bending felt good, but lifting heavy items hurt.  (*Id.*)  In addition, Plaintiff described "discomfort throughout her body primarily in the trapezius, lumbar back and upper arms."  (*Id.*)  Dr. Wagner determined that Plaintiff had "trigger points positive in trapezius, lumbar back, knees, elbows, and anterior chest wall" related to fibromyalgia.  (*Id.* at 105)  He observed that Plaintiff "was easily able to get up quickly out of the chair in the waiting room, walk at a brisk pace back to the exam room without assistance, sat completely comfortably, easily able to get on and off the exam table, easily able to bend over at the waist and take off her shoes and socks and put them back on without any difficulty."  (*Id.* at 106)  Dr. Wagner found Plaintiff had a "slightly positive" straight leg raise test in the right and left in the supine position, and she claimed "a bit of low back pulling."  (*Id.* at 107)  Plaintiff's motor strength was 5/5 in her extremities, including her grip strength.  (*Id.*)  Dr. Wagner concluded Plaintiff was able to stand and walk up to six hours, sit up to six hours, and lift and carry "50 pounds occasionally and 25 pounds frequently."  (*Id.* at 108)  He noted that Plaintiff felt unsteady, so he would "advise her not to" climb and balance on ladders or scaffolds, but she could "climb stairs with good railings."  (*Id.*)  Further, due to asthma, Dr. Wagner opined Plaintiff "should avoid working around chemicals, dust, fumes and gases."  (*Id.*)

On February 8, 2012, Dr. Richard Engeln performed a psychological evaluation, during which he administered the following tests: Wechsler Adult Intelligence Scale 4th Edition, Wechsler Memory Scale IV, and Bender-Gestalt Test II.  (Doc. 12-10 at 2)  Plaintiff reported depression runs in her family, and she had been taking medication for depression "for the last 18 years."  (*Id.* at 3)  She told Dr. Engeln that sometimes she was so depressed that she could not leave her home, and she "did not leave her house once for a six month duration."  (*Id.*)  Dr. Engeln found "no evidence any delusions, hallucinations or confusion;" her "speech was easily understood, appropriate in form and association;"

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV").  A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *Id*.

and she "presented alert and oriented." (*Id.* at 4)  According to Dr. Engeln, Plaintiff "was socially pleasant, appeared to enjoy conversational social exchanges." (*Id.*)  He determined:

> Obtained intellectual measurements are Verbal Comprehension average, and Perceptual Reasoning high in the low average range. Ms. Dadian-Wallis achieved the following IQ estimates on the WAIS-IV: Verbal Comprehension = 98; Perpetual Reasoning = 88; Working Memory, an auditory function, = 95, average; Processing Speed, a visual grapho-motor function = 94, average; Full Scale IQ = 92, average.
>
> Obtained memory scores were consistent with obtained intellectual scores.  On the WMS IV Ms. Dadian- Wallis achieved the following standard scores: Auditory Memory = 115, high average; Visual Memory = 93, average; Visual Working Memory = 91, average; Immediate Memory = 107, average; Delayed Memory = 104, average.

(*Id.* at 5)  Dr. Engeln found Plaintiff was "capable of job adjustment, in a context where instructions . . . are multidimensional, or complex, and where independence is demanded" and her concentration and social skills were "adequate for work adjustment." (*Id.* at 6)  Dr. Engeln concluded Plaintiff had no restrictions with the ability to understand, remember, or carry out simple and complex instructions; no restrictions with interacting with the public, coworkers, or supervisors; and no restrictions with adaptation. (*Id.* at 6-7)

Dr. Ernest Wong reviewed the medical record and completed a physical residual functional capacity assessment on February 29, 2012. (Doc. 12-4 at 10)  Dr. Wong noted Plaintiff had a normal range of motion in her neck and back, and no tenderness or distension upon examination. (*Id.*)  In addition, he observed that Plaintiff had normal strength and sensory exams, and was able to perform her activities of daily living without assistance. (*Id.*)  Dr. Wong concluded Plaintiff could perform medium work "with climbing and asthma limitations." (*Id.*)

Dr. Stanley Golon the record related to Plaintiff's reported mental impairments on March 9, 2012, and opined Plaintiff had "mild limitations… due to depression and anxiety." (Doc. 12-3 at 11)  Specifically, Dr. Golon believed Plaintiff had mild restrictions with activities of daily living; mild difficulties with maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.*)

On January 12, 2013, Dr. Ekram Michiel performed a psychiatric evaluation. (Doc. 12-10 at 63) Plaintiff reported she had anxiety since the age of 18, and her depression worsened after she stopped working and was diagnosed with fibromyalgia. (*Id.*)  Plaintiff told Dr. Michiel she became

"lethargic, [with] no motivation to do anything and occasionally 'out of the blue' she has panic where her heart races, she is unable to breathe, she feels dizzy and worries all of the time." (*Id.*) Dr. Michiel observed that Plaintiff "did not appear to be in distress" and "kept good eye contact throughout the interview." (*Id.* at 64) Further, Dr. Michiel found Plaintiff's "[t]hought process was goal-directed" and her "[t]hought content was not delusional." (*Id.* at 65) Plaintiff "was able to recall three out of three items after five minutes," and her "[r]emote memory did not show any impairment." (*Id.*) Dr. Michiel concluded Plaintiff was "able to maintain attention and concentration to carry out simple instructions;" "relate and interact with coworkers, supervisors and the general public;" and "handle her own funds." (*Id.* at 66) He did not believe she had the ability "to carry out an extensive variety of technical and/or complex instructions." (*Id.*) Dr. Michiel gave Plaintiff a GAF score of 50-55.[3] (*Id.* at 65)

Plaintiff had images taken of her cervical and thoracic spines in April 2013. (Doc. 12-10 at 133-34) Dr. Hildebrandt found "reversal of the cervical lordosis centered at the C5 level," as well as "[f]ocal degenerative changes with disc space narrowing with marginal osteophytes most notable at C5-6, to a lesser degree at C6-7 and C4-5." (*Id.* at 133) Dr. Hildebrandt determined the thoracic vertebrae had "normal mineralization and alignment." (*Id.* at 134) He found the "[c]ervicothoracic junction [was] notable for degenerative changes with spondylosis." (*Id.*) However, Dr. Hildebrandt concluded the thoracic study results were unremarkable. (*Id.*)

In October 2013, Plaintiff had an MRI on her lumbar spine. (Doc. 12-10 at 136) Dr. Philippe Vanderschelden found "[s]traightening of the lumbar spine . . . with multiple intraspongeous hernias involving the L1, L2 and L4 vertebrae with respect of the height of the vertebrae." (*Id.*) In addition, there was "decreased T2 signal of the intervertebral discs at the L1-2, L2-3, L4-5 and L5-S1 levels consistent with disc desiccation, with respect of the L3-4." (*Id.*)

Dr. Janardhan Grandhe, a pain specialist, completed a medical source statement regarding Plaintiff's physical impairments on February 4, 2014. (Doc. 12-10 at 139-144) Dr. Grandhe opined Plaintiff could occasionally lift up to 20 pounds and carry up to 10 pounds. (*Id.* at 139) According to Dr. Grandhe, Plaintiff could sit for one hour in an eight-hour day; stand for 30 minutes at one time and

---

[3] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34. A GAF score between 51 and 60 indicates "moderate symptoms." *Id.*

for 30 minutes total in an eight-hour day; and walk for 30 minutes at one time or fifteen minutes total in an eight-hour day. (*Id.* at 140) Dr. Grandhe explained due to low back pain, Plaintiff "ha[d] difficulty for a prolonged period of sitting, standing & walking," and that "when sitting she [needed] to get up often to stretch." (*Id.*) Dr. Grandhe noted these limitations were supported by "[p]eripheral neuropathy, which she developed as a complication of gastric bypass;" lumbar disc bulge; and fibromyalgia." (*Id.*) Dr. Grandhe observed that "fibromyalgia causes generalized body pain including hands & arms," and opined Plaintiff could never reach overhead; occasionally handle, finger, and feel; and frequently push or pull. (*Id.* at 141) Further, Dr. Grandhe indicated that Plaintiff could occasionally climb stairs and ramps, balance, and crawl; frequently stoop; and never climb ladders or scaffolds, kneel, or crouch. (*Id.* at 142) According to Dr. Grandhe, Plaintiff needed to avoid unprotected heights, moving mechanical parts, dust, odors, fumes, and pulmonary irritants; but she could be occasionally exposed to humidity, wetness, extreme cold, extreme heat, and vibrations. (*Id.* at 143)

Dr. Gurmej Dillon also completed a medical source statement regarding Plaintiff's ability to work on February 21, 2014. (Doc. 12-11 at 3-9) Dr. Dillon opined Plaintiff could occasionally lift up to 20 pounds and carry up to 10 pounds. (*Id.* at 4) In addition, he indicated Plaintiff could stand and walk for 30-45 minutes at one time and sit for one hour at one time. (*Id.* at 5) Dr. Dillion also noted Plaintiff could stand for 30 minutes total and walk for 15 minutes total in an eight-hour day. (*Id.*) Dr. Dillon opined Plaintiff needed "to have frequent breaks due to pain aggravation, experience[ing] numbness and tingling in lower extremities." (*Id.*) He believed Plaintiff was precluded from reaching overhead; could occasionally reach in other directions, handle, finger, and feel; and frequently push and pull. (*Id.* at 6) Due to "neuropathy of lower extremities," Dr. Dillion concluded Plaintiff was limited to occasional use of foot controls. (*Id.*) Finally, he opined Plaintiff could never climb ladders or scaffolds, kneel, or crouch; could occasionally climb stairs and ramps, balance, and crawl; and frequently stoop. (*Id.* at 7) Dr. Dillion believed Plaintiff had been limited to this extent since November 2010. (*Id.* at 9)

**B.     Administrative Hearing Testimony**

Plaintiff testified at the administrative hearing before the ALJ on February 24, 2014. (Doc. 12-3 at 39) She reported she graduated high school and received vocational training in healthcare administration and medical assistance. (*Id.* at 43-44) Plaintiff last worked as an "office manager for a

pulmonary and sleep disorder center," in both the front and back of the office. (*Id.* at 44) She said she "ran a staff of about 15, depending on the night time sleep techs." (*Id.*) Plaintiff reported her job duties included "[a]nything from answering phones in the morning to doing referrals of the patients, training new staff on the computer software, billing, prepar[ing] the billing to go to corporate..., scheduling, rescheduling, [and] taking care of problems that any patients had with something that happened at the office." (*Id.* at 46)

She testified she was no longer able to work due to "peripheral neuropathy," which "took years" to be diagnosed. (Doc. 12-3 at 51) Plaintiff explained she had could not eat and "the only thing [she] could keep down was iced tea," which "brought on a nutritional deficiency." (*Id.* at 52) She explained that because she "lacked the nutrition for so long, [that] brought on the peripheral neuropathy." (*Id.*) Plaintiff explained that after she regained the ability to walk, she "started having chronic nerve pain because of the nerve damage that… brought on the paralysis." (*Id.* at 51) In addition, Plaintiff said she had "chronic pain" from fibromyalgia. (*Id.* at 63) As a result of her pain, Plaintiff believed she "would not be able to concentrate" on work, or "accurately take care of patients or… do the work correctly." (*Id.* at 75)

Plaintiff reported she was not able to exercise, and her lack of mobility caused her to gain weight. (Doc. 12-3 at 53) She said she had pain in her knees, which she attributed to weight gain rather than nerve pain. (*Id.*) In addition, Plaintiff described her peripheral neuropathy as "just numbness and tingling," which mean that she had to take a break from what she was doing. (*Id.* at 54) She believed it was "not so much the peripheral neuropathy anymore as it [was] the chronic nerve pain because of getting those nerves regenerated." (*Id.*) Plaintiff said she felt "real sharp, shooting nerve pain," which was "not all day, every day," but when it hit she could not breathe. (*Id.*) She said this pain affected her "[a]rms, hands, legs, [and] feet," and her left foot more than the right "because of the nerve that they removed in [her] ankle to do the biopsy." (*Id.* at 55)

Plaintiff said she was able to drive, but only did so "[m]aybe once every two weeks," to take or pick her kids up from school, or to go do a doctor's appointment. (Doc. 12-3 at 55) She said she was "anxious to go anywhere alone, and especially if… alone with [her] kids" due to her pain. (*Id.* at 56-57) The ALJ questioned Plaintiff why she would pick her kids up from school if she was nervous, and

she responded: "if I have to get my kids, I have to get my kids." (*Id.* at 57)

She testified that she could walk up to a quarter of a mile, stand for "20 to 30 minutes" at one time, and "sit for maybe a half hour to an hour at a time." (Doc. 12-3 at 57, 59-60) She explained she would "sit often because of [her] back," but then would "have to get up and move because it's just uncomfortable." (*Id.* at 58-59) Plaintiff estimated that in an eight-hour day, she could stand for a total of "an hour and a half." (*Id.* at 59) She explained her back pain was "like somebody is just stabbing [her]," and traveled to her knees, which affected her ability to walk. (*Id.* at 63)

Plaintiff believed she could lift "10, 15 pounds" to shoulder level, but if she lifted anything over the shoulder area, she felt "really numb, weak" "within about 30 seconds." (Doc. 12-3 at 60) She said she could not repetitively reach in front of her, because "90 percent of the time [her] back hurts" and reaching an arm's length was uncomfortable. (*Id.* at 60-61) Plaintiff reported she "prefer[red] to type because of the strength and dexterity for writing," though her fingers got "numb and sore" if using a keyboard. (*Id.* at 62)

She reported that she had "bad flare-ups" with fibromyalgia that caused her to be "in bed for three days at a time." (Doc. 12-3 at 64) She said these flare-ups occurred "once every maybe ten days," and in that period she would only "get out to greet the kids when they get home [,]… to sit at the dinner table and have dinner with them, and just for … [her] basic needs." (*Id.* at 65) Other than that, Plaintiff said she would not leave the house. (*Id.*)

Plaintiff reported she also was taking medication for mental health, but was not attending counseling because she could not afford it. (Doc. 12-3 at 71-72) She testified she was "admitted…on a 72 hour hold" as a teenager when she took too many prescription pills, because her "depression was not being managed at the time." (*Id.* at 71) Plaintiff said she last received counseling about two years before the hearing. (*Id.*)

**C.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of May 1, 2007. (Doc. 12-3 at 21) At step two, the ALJ found Plaintiff's severe impairments included: "cervical degenerative disc disease with mild central canal stenosis, mild flattening of the spinal cord and moderate neural foraminal narrowing; asthma;

migraines; peripheral neuropathy; fibromyalgia; and obesity." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 21-22) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as described in 20 CFR 404.1567(b) except never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, crouch, kneel or crawl; occasional bilateral overhead reaching; occasional foot control operation with the left lower extremity; and[] avoid concentrated exposure to irritants such as fumes, odors, dust and gases.

(*Id.* at 23) Based upon this RFC, the ALJ concluded Plaintiff was able to perform past relevant work as an office manager "as actually and generally performed." (*Id.* at 30) The ALJ also found there were "other jobs existing in the national economy that she is … able to perform." (*Id.*) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 31)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ did not identify legally sufficient reasons to reject her credibility. (Doc. 15 at 9-15) On the other hand, Defendant argues the credibility determination "is supported by substantial evidence and free from material error." (Doc. 21 at 23)

**A.   ALJ's Credibility Analysis**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 12-3 at 24) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (*Id.*) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding her limitations.

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are

not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility). Here, the ALJ considered a number of factors including Plaintiff's level of activity, and inconsistencies between "the total medical and non-medical evidence." (*See* Doc. 12-3 at 29)

1. Objective medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

Importantly, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify

"what evidence suggests the complaints are not credible"). Here, the ALJ failed to identify the portions of Plaintiff's testimony she believed were inconsistent with the medical record. Rather, the ALJ provided only a summary of the entirety of the medical record. (*See* Doc. 12-3 at 24-29)

As the Ninth Circuit explained, a "summarize[ing] the medical evidence supporting [the] RFC determination… is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to … ensure that the claimant's testimony was not arbitrarily discredited." *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). As a result, "the observations an ALJ makes as part of the summary of the medical record are not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016). Although Defendant identifies inconsistencies between Plaintiff's testimony and the medical records summarized by the ALJ (*see* Doc. 16 at 19-21), these inconsistencies were not identified by the ALJ in her opinion. The Court is "constrained to *review* the reasons the *ALJ* asserts." *Brown-Hunter*, 806 F.3d at 494 (emphasis in original) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). Because the ALJ offered no more than a summary of the medical evidence and did not identify inconsistencies with the record, the objective medical record fails to support the adverse credibility determination.

2. Plaintiff's level of activity

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603). For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility where the claimant alleges she is unable to maintain attention or concentration. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008). Similarly, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant participates in community activities, gardens, and exercises. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). However, an ALJ must make a specific finding that the daily activities are transferable to a workplace to refute a claimant's allegations of disability. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2008).

Evaluating Plaintiff's activities of daily living, the ALJ noted: "She cares for her personal grooming successfully and independently. She is able to prepare simple meals, and perform light household duties. She cares for young children with the assistance of her husband." (Doc. 12-3 at 22) In examining Plaintiff's credibility, the ALJ determined:

> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(Doc. 12-3 at 29)

Significantly, this Court and others throughout the Ninth Circuit have criticized ALJs for using identical language, explaining that "simply because a fact cannot be verified objectively provides little evidence to support the conclusion that the individual is not being truthful about such fact in any particular instance." *Fisher v. Colvin*, 2015 U.S. Dist. LEXIS 20736 (E.D. Cal. Feb. 20, 2015) (quoting *Garcia v. Astrue*, 2013 U.S. Dist. LEXIS 61039, *49 (S.D. Cal. Mar. 13, 2013)); *see also Baxla v. Colvin,* 45 F. Supp. 3d 1116, 1128 (D. Ariz. 2014) ("that a fact cannot be verified objectively provides little evidence to support the conclusion that the individual is not being truthful about such fact in any particular instance"); *Altamirano v. Colvin*, 2013 U.S. Dist. LEXIS 103891 at *23 (C.D. Cal. July 24, 2013) (noting that "objective verifiability to a reasonable degree of certainty is not a requirement imposed by law").

The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Furthermore, the ALJ failed to find that Plaintiff's limited activities could be transferred to a work setting. As a result, Plaintiff's level of activity was not clear and convincing evidence to discount her credibility. *See Orn*, 495 F.3d at 639 (the ALJ erred rejecting a claimant's credibility where his "activities [did] not meet the threshold for transferable work skills, the second ground for using daily

activities in credibility determinations"); *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting). Thus, Plaintiff's activities of daily living do not support the adverse credibility determination.

### 3. Inconsistencies

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). For example, in *Thomas*, the ALJ determined the claimant "had not been a reliable historian, presenting conflicting information about her drug and alcohol usage." *Id.*, 278 F.3d at 959. Ms. Thomas denied using drugs and alcohol to one physician, but later "admitted to alcoholism and to smoking 'a little pot.'" *Id.* On another occasion, Ms. Thomas reported "she had not drunk alcohol for 'several months' and 'had not smoked marijuana for about a year." (*Id.*) The Ninth Circuit determined the ALJ did not err by inferring "that this lack of candor carries over to her description of physical pain." (*Id.*)

Here, the ALJ opined Plaintiff's credibility was diminished because "[t]he severity of the symptoms and the alleged effect on function [was] not entirely consistent with the total medical and non-medical evidence, including statements by the claimants and others, observations regarding activities of daily living, and alternations of usual behavior or habits." (Doc. 12-3 at 29)  Beyond this broad language, the ALJ fails to specify any inconsistencies.  For example, the ALJ does not identify any contradictory statements by Plaintiff, or statements she made that were contradictory to the observations of others.  Further, the ALJ fails to explain what "alternations of usual behavior or habits" Plaintiff made, or how such actions were inconsistent with her testimony.  Because the ALJ fails to identify statements by Plaintiff or explain how the statement was "not entirely consistent" with other evidence in the record, this factor does not support the adverse credibility determination. *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (the ALJ has a burden to "identify what testimony is not credible and what evidence undermines the claimant's complaints").

### 4. Conclusion

The ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367

14

F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.  The ALJ's failure to specifically discuss and identify what portions of Plaintiff's testimony she found not credible also constituted a failure to apply the correct legal standards in evaluating the credibility of Plaintiff's testimony. As a result, the reasons for rejecting Plaintiff's credibility cannot be upheld by the Court.

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed.  *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).  The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate.  *Lester*, 81 F.3d at 834.

However, courts retain flexibility in crediting testimony as true.  *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there were insufficient findings as to whether the plaintiff's testimony should be credited as true). A remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Consequently, the matter should be remanded for the ALJ to

15

re-evaluate the evidence.

## CONCLUSION AND ORDER

As set forth above, the ALJ failed to articulate clear and convincing reasons supported by substantial evidence in the record to reject Plaintiff's subjective complaints. As a result, the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Marcy Marie Dadian Wallis and against Defendant, Nancy Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 8, 2017**              **/s/ Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE